## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Center for Science in the Public Interest** | ) |
| Plaintiff, | ) ) ) Civil Action No. ) ) |
| v. | ) ) |
| **Burger King Corporation** | ) ) |
| Defendant. | ) ) ) ) |

### NOTICE OF REMOVAL

Defendant Burger King Corporation ( "Defendant"), pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 respectfully submits this Notice of Removal. As grounds for removal, Defendant states as follows:

1.      On May 16, 2007, Plaintiff commenced an action in the Superior Court of the District of Columbia, Civil Division, case number 2007 CA 003363 B (the "State Court Action"). On May 22, 2007, Defendant's agent, CT Corporation received a copy of the Summons, Complaint, and Initial Order in the State Court Action by mail under District of Columbia Superior Court Procedure Rule 4(c)(4). A true and correct copy of the Summons, Complaint, and Initial Order, as received by Defendant, is attached as Exhibit A. Defendant was never formally served with the Summons, Complaint and Initial Order. However, Defendant has waived formal service. Defendant has not yet

responded to the Complaint but has agreed with Plaintiff's counsel that it will answer or move with respect to the Complaint on or before July 20, 2007.

2.      This Notice of Removal is timely filed under 28 U.S.C. § 1446(b), which provides that a defendant may file a notice of removal "within thirty days after the receipt . . . of a copy of the initial pleading setting forth the claim for relief." 28 U.S.C. § 1446(b).

3.      This Court has original jurisdiction over this action under 28 U.S.C. § 1332(a) since the parties are citizens of different States and the amount in controversy exceeds $75,000.  Removal is authorized, therefore, by 28 U.S.C. § 1441.

## I.      Defendant and Plaintiff are Citizens of Different States

4.      Diversity of citizenship is met if plaintiff and defendant are "citizens of different states." 28 U.S.C. § 1332(a) (1).

5.      Defendant, Burger King Corporation is a corporation organized under the laws of the State of Florida with its principal place of business at 5505 Blue Lagoon Drive, Miami, FL 33126.  Affidavit of Jonathan Muhtar, ¶3.

6.      Plaintiff, the Center for the Science in the Public Interest ("CSPI") is a non-profit organization based in the District of Columbia.  Compl. ¶ 13.  The CSPI brings the suit on behalf of itself, its 3,200 D.C. Members, and D.C. Consumers.  Compl. ¶ 5.

7.      Since Burger King Corporation is a citizen of Florida and the CSPI is a citizen of the District of Columbia, the diversity of citizenship requirement of 28 U.S.C. § 1332(a) is met.

2

## II.    The Amount in Controversy Threshold is Met

7.    The amount in controversy requirement is met if the sum or value exceeds $75,000, exclusive of interests and costs.  28 U.S.C. § 1332(a).

8.    In order to establish the $75,000 threshold in an action seeking injunctive relief, the Court "may look to either the value of the right that plaintiff seeks to enforce or to protect or to the cost to the defendants to remedy the alleged denial."  Smith v. Washington, 593 F.2d 1097, 1099 (D.C. Cir. 1978) (internal citation omitted) (emphasis added).

9.    With no factual basis, Plaintiffs make the conclusory statement that the "cost to Burger King of all relief sought is less than $74,000."  Compl. ¶ 11.  This statement, however, is demonstrably incorrect.

10.    The CSPI seeks as its primary form of relief a permanent injunction ordering the Defendant "to cease selling foods prepared with trans fats oils and foods that contain significant levels of trans fats in its restaurants . . . . ."  Compl. ¶ 47.

11.    This relief, if granted, would require Defendant and its franchisees to modify Burger King cooking processes to eliminate the use of partially hydrogenated oil, and to substitute certain pre-prepared par fried foods and baked goods that contain trans fats with different products.  The required changes would have to be made for all seven Burger King restaurants in the District of Columbia.  As described more fully in the Affidavit of Jonathan Muhtar, the cost of such changes would substantially exceed $75,000.

3

12.    Since the cost of relief substantially exceeds $75,000, the amount in controversy requirement is satisfied and the Court has jurisdiction under 28 U.S.C. 1332(a) (1).

**III.    Filing with Superior Court of the District of Columbia; Right to Amend**

13.    Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being filed with the Clerk of the Superior Court of the District of Columbia and is being served on Plaintiff.

14.    · Defendant reserves the right to amend or supplement this Notice of Removal.

Dated: Washington, D.C.

June 15, 2007

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

Ada Fernandez Johnson (Bar No. 463296)
555 12th St., N.W.
Suite 1100E
Washington, D.C. 20004
Telephone: (202) 383-8000
Facsimile: (202) 383-8118

and

Roger E. Podesta
Erich Grosz
Terrianne Muenzen
919 Third Avenue
New York, New York 10022

4

Telephone: (212) 909-6000
Facsimile: (212) 909-6836

5

# EXHIBIT A

MAY-22-2007  15:58        C T CORP SYS DC                                      202 572 9633      P.07



# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

CENTER FOR SCIENCE IN THE PUBLIC INTEREST
    Vs.
BURGER KING CORPORATION                          C.A. No.      2007 CA 003363 B

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("SCR Civ") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the Summons, the Complaint, and this Initial Order, and any General Order issued **by the judge** to whom the case is assigned. As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in SCR Civ 4(m).

(3) Within 20 days of service as described above, except as otherwise noted in SCR Civ 12, each defendant must respond to the Complaint by filing an Answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in SCR Civ 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an Initial Scheduling and Settlement Conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than six business days before the scheduling conference date. No other continuance of the conference will be granted except upon motion for good cause shown.

                                                Chief Judge Rufus G. King, III

Case Assigned to: Judge JENNIFER M ANDERSON
Date:  May 16, 2007
Initial Conference: 9:30 am, Friday, August 24, 2007
Location:   Courtroom A-50
            515 5th Street N.W.
            WASHINGTON, DC 20001

Caio.doc

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement. The early mediation schedule shall be included in the Scheduling Order following the ISSC. Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator. Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/. To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. Two separate Early Mediation Forms are available. Both forms may be obtained at www.dccourts.gov/medmalmediation. One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator. Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 105, 515 5th Street, N.W. (enter at Police Memorial Plaza entrance). Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov. *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles. All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a). If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case. D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code § 16-2826. Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Clerk's Office. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Rufus G. King, III

Cain.doc

CA Form 1

# Superior Court of the District of Columbia
## CIVIL DIVISION
### 500 Indiana Avenue, N.W., Room JM-170
### Washington, D.C. 20001  Telephone: 879-1133

| Center for Science in the Public Interest |
| --- |

*Plaintiff*

vs.

| Burger King Corporation |
| --- |

*Defendant*

Civil Action No.  **0003363-07**

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon your exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government you have 60 days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear **below**. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue. N.W. between 9:00 am. and 4:00 pm., Mondays through Fridays or between 9:00 am. and 12:00 Noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

| Steven N. Berk |
| --- |

Name of Plaintiff's Attorney

| 1225 Fifteenth St. NW |
| --- |

Address

| Washington, DC 20005 |
| --- |

| (202) 232-7550 |
| --- |

Telephone

By _____
Deputy Clerk

Date  5/16/07

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA, 500 INDIANA AVENUE, N.W., SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C., 500 INDIANA AVENUE, N.W., ROOM JM 170

Form CV(t)-456/Mar. 95

**NOTE:** SEE IMPORTANT INFORMATION ON BACK OF THIS FORM.

MAY-22-2007  15:59        C T CORP SYS DC                    202 572 9633      P.10

IMPORTANT: IF YOU FAIL TO SERVE AND FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, DO NOT *FAIL TO ANSWER WITHIN THE REQUIRED TIME*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (628-1 161) or the Neighborhood Legal Services (682-2700) for help or come to Room JM 170 at 500 Indiana Avenue, N.W., for more information concerning where you may ask for such help.

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| Center for Science in the Public Interest, | § | **0003363-07** |
| | § | |
| Plaintiff, | § | Civil Action No. _____ |
| v. | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Burger King Corporation,** | § | |
| 5505 Blue Lagoon Drive | § | 1.  Violation of D.C. Consumer Protection |
| Miami, FL 33126 | § | Procedures Act: Deception |
| | § | D.C. Code § 28-3901, et seq. |
| Defendant. | § | |
| | § | 2.  Violation of D.C. Consumer Protection |
| Serve: CT Corporation System | § | Procedures Act: Breach of Implied |
| 1015 15th Street, NW, Suite 1000 | § | Warranty of Merchantability |
| Washington, DC 20005 | § | D.C. Code § 28:2-314 |

RECEIVED
Civil Clerk's Office
MAY 16 2007
Superior Court of the
District of Columbia
Washington, D.C.

### ORIGINAL COMPLAINT

1.   Trans fat is a killer when let loose in the bloodstream. It *increases* the bad (LDL) cholesterol, which slowly helps form dangerous deposits on the inner walls of arteries, including those that feed the heart and brain. Trans fat also *decreases* the good (HDL) cholesterol, which carries cholesterol away from the arteries and protects against heart attacks. In addition, trans fat causes heart disease by hardening artery walls.

2.   Trans fat kills—bite-by-bite, fry-by-fry. Knowing this, Defendant Burger King Corporation (Burger King) continues to require its restaurants to use trans-fat-containing oils. Burger King not only sells food cooked with this harmful ingredient, it does so without warning its customers about the life-threatening consequences. Consumers have no way to guard against the risk of consuming trans fats. Meanwhile, Burger King's top competitors (e.g., Wendy's and KFC) have either largely eliminated trans fats in all stores, or are making strong progress in that direction (McDonald's).

3.   Since learning of the dangers of using trans fats, all leading restaurant chains have eliminated, or are in the process of eliminating, trans fats from their kitchens. All, that is, except

- 1 -

Burger King, which persists in using trans fats, in the par-fried products it ships to restaurants, as a frying oil, and as an ingredient in baked foods — all the while concealing from consumers the health risks of eating such foods. These practices render Burger King's products unsafe and unmerchantable under the laws of the District of Columbia (D.C.).

4.      The Center for Science in the Public Interest (CSPI) accordingly asks the Court to issue an injunction ordering Burger King to stop adulterating its food with trans fats and/or to display appropriate consumer warnings regarding the presence of trans fats in its food.

## PRELIMINARY STATEMENT

5.      CSPI brings this action on its own behalf, on behalf of its members residing in D.C., and on behalf of the interests of the general public (D.C. Consumers), to protect the health and welfare of D.C. Consumers by compelling Burger King to stop using trans fatty acids – commonly known as "trans fats" – in its French fries, baked goods, and other foods or at least to inform consumers of the presence of the harmful fat that is undetectable by any of the senses.

6.      CSPI brings this action under D.C. law for equitable relief necessary as a result of Burger King's use of dangerous trans fats to prepare its food items for sale to D.C. Consumers.

7.      CSPI also seeks attorneys' fees and costs.

8.      All conditions precedent to the filing of this case have been performed, have occurred, or have been satisfied.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this action pursuant to D.C. Code §§ 11-921 and 28-3905(k)(l).

10.     The Court has jurisdiction over Burger King because it is a corporation that is authorized to conduct, and in fact does conduct, substantial business in D.C. Burger King has sufficient minimum contacts with D.C. or otherwise intentionally avails itself of the consumer

markets within D.C. through the promotion, sale, marketing, and/or distribution of its foods in D.C. to render the exercise of jurisdiction by the D.C. courts permissible under traditional notions of fair play and substantial justice.

11.     CSPI does not seek judgment for any form of monetary damages for itself, its D.C. Members, or for any D.C. Consumer. The total benefit or value to CSPI, its D.C. Members, or any D.C. Consumer of all relief sought is less than $74,000 per person. The cost to Burger King of all relief sought is less than $74,000.

12.     Venue is proper in D.C. because CSPI's headquarters are in D.C., the acts on which this action is based occurred in D.C., and D.C. Consumers purchased food items at Burger King locations in D.C. that contained trans fats, and were thereby injured and subjected to irreparable harm in this venue. Burger King received substantial compensation and profits from sales of such food items in D.C. Thus, Burger King's liability arose and continues in D.C.

## PARTIES

13.     CSPI is a non-profit organization based in D.C. Since 1971, CSPI has been a strong advocate for nutrition and health, food safety, alcohol policy, and sound science. Its award-winning newsletter, *Nutrition Action Healthletter*, with some 900,000 subscribers in the United States and Canada, is the largest-circulation health newsletter in North America. CSPI has approximately 3,200 members in D.C.

14.     Founded in 1971 by executive director Michael Jacobson, Ph.D., and two other scientists, CSPI has carved out a niche as the organized voice of the American public on nutrition, food safety, health, and other issues. CSPI has long sought to educate the public, advocate government policies that are consistent with scientific evidence on health and environmental issues, and counter industry's powerful influence on public opinion and public policies. Over the years, CSPI has grown along with its reputation as an influential and

- 3 -

MAY-22-2007  16:00        C T CORP SYS DC                    202 572 9633    P.14

independent science-based organization. Though CSPI frequently criticizes the performance of the U.S. Food and Drug Administration (FDA), one indication of the respect CSPI has garnered is that the FDA honored it with the Commissioner's Special Citation, the highest award given to outside organizations or individuals (a decade ago Dr. Jacobson was honored with the same award).

15.    CSPI's accomplishments include leading efforts to win passage of laws that protect the public's health and welfare by requiring Nutrition Facts on packaged foods (and, later, to include trans fat on those labels), defining the term "organic" for foods, and putting warning notices on alcoholic beverages. CSPI has also conducted the best studies on the nutritional quality of restaurant meals and movie theater popcorn, helped to increase funding for the government's food safety inspections and nutrition and physical activity programs, and spurred new policies to remove soda and junk foods from schools. CSPI also helped New York City adopt the nation's first law to ban trans fat from restaurants and the first regulation to list calorie information on menus and menu boards at certain large restaurant chains. CSPI is working with other cities and states on similar measures.

16.    Defendant Burger King is a corporation organized and existing under the laws of the State of Florida, with its principal place of business located at 5505 Blue Lagoon Drive, Miami, FL 33126. Burger King Corporation dictates the ingredients and manner of preparation for the foods sold in all Burger King restaurants.

17.    Various individuals, partnerships, corporations, and associations (including franchisees) not named as defendants in this Complaint have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof. In so acting or omitting to act, each such individual and entity was acting as an agent or representative of Burger King.

- 4 -

## REPRESENTATIVE ACTION

18.    CSPI brings this action on behalf of itself, its D.C. Members, and as a representative Plaintiff acting for the interests of D.C. Consumers, seeking relief pursuant to and from Burger King's use of trade practices that violate D.C. law, pursuant to D.C. Code § 28-3905(k)(l).

## FACTS ABOUT TRANS FAT

19.    Trans fat has severe adverse physiologic effects. It is produced artificially when natural vegetable oil is heated in the presence of metal catalysts and hydrogen. This process changes the molecular structure of the oil. Like saturated fat, it increases the bad (LDL) cholesterol in blood. But unlike saturated fat, trans fat also decreases the good (HDL) cholesterol in blood. It affects the walls of blood vessels in ways that increase the risk of heart disease. It also increases the risk of diabetes. About 80% of the trans fats Americans consume is from partially hydrogenated vegetable oil, the rest naturally occurring at low levels in beef and milk and in purified non-hydrogenated vegetable oils.

20.    The hydrogenation process causes molecular changes that increase the melting point of liquid oils (making them more solid) and confer properties useful to fast-food companies. Hydrogenation turns liquid vegetable oils into fats that are solid or semi-solid at room temperature, but liquid when heated. The resulting inexpensive trans-fat-containing frying oils are reputed to have a longer shelf life and fry life than other oils (though that presumption is frequently not the case). That makes them useful for fried foods like French fries and chicken sticks. Partially hydrogenated oils may also confer a crisper texture to cookies and better baking quality to pie crusts, making such oils attractive to bakeries. Some of the large fast-food restaurants, including Burger King, began using partially hydrogenated vegetable oil since about 1990, in response to public health concerns about saturated fats like beef fat, which they had

- 5 -

been using. The general presumption at that time was that partially hydrogenated oils and trans

fats were not as harmful as beef fat.

     21.    But beginning in about 1990 a rapidly growing body of scientific research has

demonstrated that trans fat is a killer — on a gram-for-gram basis, *more harmful than any other*

*type of fat*. It causes heart disease and heart attacks. A 2% increase in trans fat consumption

corresponds to as much as a 23% increase in the risk of developing coronary heart disease. A

Harvard School of Public Health report estimates that *eliminating trans fats from diets could*

*prevent 30,000 to 100,000 deaths in the U.S. annually*. More recently, Harvard researchers

determined that the *near-elimination of industrially produced trans fats might avert between*

*72,000 and 228,000 heart attacks in the U.S. each year*.

     22.    In 2003, the National Academy of Science's Institute of Medicine recommended

that individuals consume as little trans fats as possible. In 2004, a U.S. Food and Drug

Administration advisory panel concluded that trans fat (on a gram-for-gram basis) is even more

harmful to humans than saturated fat.

     23.    Recently, the American Heart Association revised its diet and lifestyle guidelines

to recommend limiting trans fats to less than 1% of total calories — just two grams or about *20*

*calories per day*.

     24.    Burger King requires all locations in D.C. to use partially hydrogenated oil, which

is very high in trans fats. Some foods (such as French fries) may be par-fried in partially

hydrogenated oil before being shipped to restaurants, where they are fried a second time in

another trans fatty oil.

     25.    The amount of trans fats in Burger King food is significant, especially compared

to the Heart Association's daily maximum. For example:

- 6 -

- French Toast Kid's Meal (with syrup): 4.5 g trans fat — **more than twice the maximum** (in a meal aimed at children)

- King Size Onion Rings: 6 g trans fat — **three times the maximum**

- Sausage, Egg, & Cheese Biscuit: 6 g trans fat — **three times the maximum**

- King Size French Fries: 7 g trans fat — **more than three times the maximum**

- Large Hash Browns: 13 g trans fat — **more than six times the maximum**

26.    Partially hydrogenated oil is absolutely unnecessary to the preparation of Burger King's (or any other) foods. Various other oils are available that are free of trans fats and suitable for use in commercial food preparation.

27.    Burger King is currently the third-largest restaurant chain, in terms of sales. The other members of the Top 10 restaurants are McDonald's, Kentucky Fried Chicken, Pizza Hut, Wendy's, Subway, Taco Bell, Domino's Pizza, Starbucks, and Applebee's Neighborhood Grill and Bar.

28.    Each of the other Top 10 restaurants either has already switched to trans-free oils or is currently switching over, or already sells foods that contain little or no frying oil.

29.    Burger King recognizes the harm that trans fat causes when it is consumed. Burger King has said that it has future plans to change to trans-free oil, but refuses to change in a reasonably timely manner or inform its customers before they select their foods that certain foods contain substantial amounts of trans fats. Although it knows that its continued protracted use of trans fat oils contributes to the deaths of thousands of Americans a year, Burger King is unwilling to commit to *start removing* trans fats from all its restaurants *until the end of 2008*. This nearly two-year delay is inexcusable given every other large restaurant chain's commitment — and ability — to switch to trans-free oils either already or in the immediate future.

30.    CSPI met privately with Burger King representatives several times, in person and by telephone, beginning in late January 2007. Burger King refused to make any commitments

- 7 -

regarding the elimination of trans fats other than vaguely representing that it would start doing so at the end of 2008. It also refused to agree to post warnings about trans fats until such time as it in fact eliminates trans fats completely.

31.    The minor cost to Burger King in converting its equipment to use trans-free cooking oil is no excuse for using partially hydrogenated oil and exposing millions of its consumers to the long-term, and potentially deadly, harm inherent in the use of trans fats.

32.    Furthermore, there is no evidence that a switch to trans-free oil would have any adverse impact on Burger King's sales. Wendy's made the switch nearly two years ago, and Wendy's has said that its customers have not noticed and there has been no drop in sales.

33.    Burger King's practice is made far worse by the fact that it does not make any real effort to inform its customers that they are eating food items prepared with the most harmful oil possible.

34.    Consumers have a growing general awareness of trans fat and the need to avoid it, but Burger King does not disclose to its customers that it uses products par-fried with trans fats and oils with trans fats in its cooking. No consumer can tell through taste, smell, or visual inspection that Burger King still uses partially hydrogenated oil, because it appears only as a hot liquid in the frying equipment seen by consumers.

35.    Burger King's failure to: (1) discontinue its use of products containing trans fats and (2) warn its customers that it is subjecting them to serious and unnecessary health risks is outrageous, and harms the health of its customers. It is also a violation of D.C. consumer protection and warranty laws, thereby entitling CSPI, individually and as a representative of its D.C. Members and D.C. Consumers, to the relief requested.

## COUNT I

## VIOLATION OF D.C. CONSUMER PROTECTION PROCEDURES ACT

### DECEPTION AND MISREPRESENTATION

36.    The D.C. Consumer Protection Procedures Act (Act) provides that it is a violation, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to fail to state a material fact if such failure tends to mislead. D.C. Code § 28-3904(f).

37.    Burger King violates D.C. Code § 28-3904(f) by, among other things:

- Failing to state in a manner readily seen by its customers the material fact of the type of oils it is using for preparing foods, with the intent or effect of deceiving or misleading D.C. Consumers.

- Failing to disclose that the consumption of Burger King's foods prepared with trans fats increases the risk of heart disease and is generally harmful to health.

D.C. Consumers, including individuals who are members of CSPI, have purchased Burger King foods without knowing about the presence of trans fats. This conduct violates the rights of CSPI, its members, and D.C. Consumers protected by the Act.

## COUNT II

## VIOLATION OF D.C. CONSUMER PROTECTION PROCEDURES ACT

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

38.    The Act also provides that it is a violation to sell consumer goods in a condition or manner not consistent with sections 28:2-312 through 318 of the D.C. Code (part of the D.C. version of the Uniform Commercial Code). D.C. Code § 28-3904.

39.    D.C. Code § 28:2-314 provides:

1. Unless excluded or modified (section 28:2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

2. Goods to be merchantable must be at least such as

- 9 -

a.    pass without objection in the trade under the contract description; and

b.    in the case of fungible goods, are of fair average quality within the description; and

c.    are fit for the ordinary purposes for which such goods are used; and

d.    run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

e.    are adequately contained, packaged, and labeled as the agreement may require; and

f.    conform to the promises or affirmations of fact made on the container or label if any.

These warranties are implied in every sale of Burger King food in D.C. and have not been excluded or modified.

40.    D.C. Consumers, including individuals who are members of CSPI, have purchased Burger King foods covered by this implied warranty.

41.    Burger King's food cooked with partially hydrogenated oil is adulterated under D.C. Code § 48-103, as it bears or contains an artificial, poisonous, or deleterious substance that is injurious to health, and that the ordinary consumer, unschooled in nutrition and perhaps preoccupied with other matters, would not reasonably expect to encounter. Burger King prepares its foods in an unreasonably unsafe way using partially hydrogenated oil containing trans fats, rendering its foods unsafe from the point of view of the ordinary consumer. Burger King's foods are neither of fair average quality nor fit for human consumption. Therefore, Burger King's food is adulterated. D.C. Code § 48-103.

42.    Burger King foods purchased by D.C. Consumers are not adequately described on menu boards (in stores and at drive-thrus) and other places to advise D.C. Consumers that they

are consuming dangerous trans-fat-containing products and exposing their health to serious injury.

43.     Burger King's practices are therefore in breach of the implied warranty of merchantability, because Burger King food containing trans fats is: (1) not of fair or average quality; (2) not fit for the ordinary purpose of human consumption; and/or (3) not adequately described on menu boards and in promotional materials so as to advise D.C. Consumers that many of Burger King's foods contain dangerous amounts of trans fats. D.C. Code §28:2-314.

44.     Burger King's breaches of implied warranty violate the rights of CSPI, its members, and D.C. Consumers protected by the Act.

## RELIEF SOUGHT

45.     The Act provides that any "person, whether acting for the interests of itself, its members, or the general public, may bring an action under this chapter in the Superior Court of the District of Columbia seeking relief from the use by any person of a trade practice in violation of a law of the District of Columbia." D.C. Code § 28-3905(k)(1).

46.     Remedies under the Act include an injunction against the use of the unlawful trade practice, reasonable attorneys' fees, and any other relief that the Court deems proper. D.C. Code § 28-3905(k)(1).

**Injunctive relief**

47.     Burger King's past and continued use of trans fats, as well as its past and continued failure to disclose that its food items are prepared with trans fats, has caused and continues to cause irreparable harm to the consuming public, thereby entitling CSPI, its D.C. Members, and D.C. Consumers to an injunction ordering Burger King: (1) to cease selling foods prepared with trans fat oils and foods that contain significant levels of trans fats in its restaurants or, in the alternative, (2) to take all necessary actions to insure that the consuming public knows,

- 11 -

immediately prior to purchasing any such food, that a food is prepared with trans fats. D.C. Code § 28-3904(x) and § 28-3905(k)(l)(D).

**Declaratory relief**

48.     An actual controversy has arisen between CSPI, its D.C. Members, and D.C. Consumers on the one hand, and Burger King on the other hand, as to Burger King's obligations to D.C. Consumers who: (1) unknowingly purchased foods cooked with partially hydrogenated vegetable oil in the past; and (2) purchase food prepared with trans fats at Burger King restaurants in the future. Specifically, CSPI contends that the acts and practices as alleged in this Complaint are unfair and unlawful under the Act.

**Attorneys' fees and costs**

49.     Burger King's acts and practices entitle CSPI to an award of attorneys' fees and costs. D.C. Code § 28-3904(x) and D.C. Code § 28-3905(k)(l)(B).

## PRAYER FOR RELIEF

CSPI, on behalf of itself, its D.C. Members, and as a representative Plaintiff acting for the interests of D.C. Consumers, prays for relief against Burger King, as follows:

1.     An order finding and declaring that Burger King's acts and practices as challenged herein are unlawful and deceptive;

2.     An order enjoining Burger King's continued use of trans fats or, in the alternative, ordering Burger King to take all necessary actions to insure that D.C. Consumers are informed, immediately prior to buying any Burger King food prepared using trans fats, that the food contains trans fats;

3.     Reasonable attorneys' fees;

4.     Costs; and

5.     Other relief as the Court deems just and proper under the circumstances.

# JURY DEMAND

CSPI demands trial by jury on all claims for which there is a right to a jury trial.

Dated: May 16, 2007

Respectfully submitted,

**Chavez & Gertler LLP**
Steven N. Berk
(D.C. Bar No. 432870)
1225 Fifteenth Street NW
Washington, D.C. 20005
Telephone: 202-232-7550
Facsimile: 202-232-7556

**Center for Science in the Public Interest**
Stephen Gardner, Director of Litigation
(D.C. Bar No. 500296)
5646 Milton St., Ste. 211
Dallas, Texas 75206
Telephone: 214-827-2774
Facsimile: 214-827-2787

Of Counsel:

**Chavez & Gertler LLP**
Mark A. Chavez (Cal. Bar No. 90858)
Nance F. Becker (Cal. Bar No. 99292)
Daniel Swerdlin (Cal. Bar No. 243452)
42 Miller Avenue
Mill Valley, CA 94941
Telephone: 415-381-5599
Facsimile: 415-381-5572

Attorneys for the Center for Science in the Public Interest
By:

Steven N. Berk

- 1 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Center for Science in the Public Interest | ) ) ) ) Civil Action No. |
| Plaintiff, | ) ) |
| v. | ) ) |
| **Burger King Corporation** | ) ) |
| Defendant. | ) ) ) ) |

## <u>AFFIDAVIT OF JONATHAN MUHTAR</u>

I, Jonathan Muhtar, hereby affirm under penalty of perjury:

     1.    I have been the Director of Product Marketing for Burger King

Corporation since August 2006 and have been employed by Burger King Corporation

since July 2004.

     2.    My job responsibilities include marketing for burgers, chicken, fries and

sides.  As a result of my job responsibilities, I have personal familiarity with the facts set

forth herein.

     3.    Burger King Corporation is a corporation organized under the laws of the

State of Florida with its principal place of business at 5505 Blue Lagoon Drive, Miami,

FL 33126.

4.     As explained more fully below, if the injunctive relief requested by Plaintiffs were granted, the cost of compliance to Burger King Corporation and its franchisees would be well in excess of $75,000.

5.     Burger King Corporation has seven franchised restaurants in the District of Columbia.

6.     There are two primary sources of the trans fat present in Burger King products (in addition to the trans fat naturally present in certain meat and dairy products).

7.     First, artificial trans fats are present in partially hydrogenated oil used in restaurants to prepare certain Burger King® products.

8.     In order to cease using partially hydrogenated vegetable oil, Burger King Corporation and its franchisees would need to go through a series of steps to replace the cooking oil, including:

a.     Completing research on an alternative oil;

b.     Completing tests on the alternative oil to ensure that it is compatible with existing equipment and does not alter the taste and quality of the food product;

c.     Entering into supply contracts to obtain the alternative oil in quantities and under delivery terms sufficient to meet the needs of the D.C. franchises; and

d.     Modifying operational manuals to instruct franchisees in the proper use of the replacement oil.

9.     The second primary source of artificial trans fats in Burger King products are the pre-prepared "par-fried" food products and baked goods that Burger King franchisees purchase from approved suppliers, then sell at the franchise restaurants.

22486840v3

Attached as Exhibit 1 is a list of the par-fried products and baked goods containing trans fats that are currently available in the D.C. franchises.

10.     In order to eliminate these sources of artificial trans fats, Burger King Corporation would need to either replace these par-fried products and baked goods with artificial trans free products, or discontinue their sale entirely.

11.     Replacing the par-fried products and baked goods with trans free products would require:

    a.     Researching alternative products; and

    b.     Negotiating supply contracts in quantities and under delivery terms sufficient to meet the needs of D.C. franchises; and

    c.     Incurring incremental costs for new ingredients.

12.     If Burger King Corporation could not find an adequate alternative, it would need to discontinue the use of par-fried products and baked goods entirely, which would result in at least a loss of twenty-five percent of the total menu mix.  Since revenues for each franchised restaurant located in the District of Columbia exceed $1 million per year, the cost of discontinuing these items would be at least $250,000 per franchised restaurant per annum.  If these franchisees were unable to sell French fries, the impact to customer visitation could be even greater.

13.     Even putting aside the potential cost of forced discontinuation of a substantial number of menu items, the cost of the measures outlined in paragraphs 8 and 11 to Burger King Corporation would substantially exceed $75,000.

22486840v3

I declare under the penalty of perjury that the foregoing is true and correct.

Executed at Miami, Florida on June 13 2007.


Jonathan Muhtar

4

<u>EXHIBIT 1</u>

BK™ Chicken Fries
CHICKEN TENDERS®
TENDERCRISP® Chicken sandwich
French Toast Sticks
Onion Rings
French Fries
CHEESY TOTS™
Biscuits
CROISSAN'WICH®