**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| Center for Science in the Public Interest | ) ) ) ) | Civil Action No. 1:07-cv-01092 |
| Plaintiff, | ) ) | (RJL) |
| v. | ) ) | Judge Richard J. Leon |
| Burger King Corporation | ) ) | |
| Defendant. | ) ) ) | |

**OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

In its remand brief, the Center for Science in the Public Interest ("CSPI") makes the remarkable concession that it has not alleged any injury-in-fact sufficient to confer constitutional standing under Article III. See Statement of Points and Authorities in Support of Plaintiff's Motion to Remand ("Plaintiff's Brief"), at 4. Recognizing as it must that this case cannot proceed in federal court, it contends that the proper disposition is not an outright dismissal, but rather remand to D.C. Superior Court. In so arguing, CSPI describes itself as possessing so-called "representational standing," which CSPI claims is insufficient in federal court, but nonetheless satisfies D.C. standing requirements. This argument fails for two reasons. First, the District of Columbia courts, although Article I courts, apply the same standing requirements as federal Article III

1

courts.  Second, representational standing is nothing new - - both federal and D.C. courts have long recognized associational standing and have permitted associations to bring suit on behalf of their members in certain situations if those members have sustained the requisite injury-in-fact.  In this case, because neither CSPI nor its members are alleged to have sustained any actionable injury-in-fact, CSPI lacks standing in both federal and D.C. courts.  Since this case will undoubtedly suffer the same fate of dismissal for want of standing in the event of remand to D.C. Superior Court, this court should follow the approach of Judge Robertson in Hoyte v. KFC Corporation and Judge Collyer in Williams v. Purdue Pharma Company, both discussed below, and dismiss this lawsuit outright.  CSPI's proposed course of remand followed by an inevitable dismissal in D.C. Superior Court would result only in a waste of judicial resources, as convincingly demonstrated by the subsequent history of the Randolph v. ING case upon which CSPI principally relies in support of its motion to remand.

## ARGUMENT

A.     **CSPI's Lack of Standing, On Behalf of Itself and Its Members, Should Be Met with Dismissal, Not Remand.**

CSPI's desperate attempt to avoid federal jurisdiction has led it to make an argument not usually made by a plaintiff – that it does not have standing to bring suit.  In doing so, CSPI has attempted to create a new breed of standing, which it refers to as "representational standing."  According to CSPI, representational standing does not

satisfy "traditional Article III standing" for federal jurisdiction, but it is somehow sufficient to satisfy jurisdiction under D.C. law. [1] (Plaintiff's Brief, at 4).

There is nothing new about CSPI's form of representational standing – it is a re-packaged version of associational standing, which has long been recognized by federal and D.C. courts. An association may bring a lawsuit on behalf of its members "only if (1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." Grassroots Recycling Network v. U.S. Envtl. Prot. Agency, 429 F. 3d 1109, 1111 (D.C. Cir. 2005) (internal citations omitted); Friends of Tilden Park v. District of Columbia, 806 A.2d 1201, 1207 (D.C. 2002) (quoting Hunt v. Washington Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)). A member would have standing to sue in its own right only if it suffered "injury-in-fact – an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)).

---

[1]    CSPI may be relying upon the preamble language to the DCCPPA which provides that "[i]t shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby . . . ." D.C. Code § 28-3904 (2007). Whatever implications this language may have for administrative or criminal proceedings, it does not obviate the need for private party plaintiffs such as CSPI to meet standing requirements. Williams v. Purdue Pharma Co., 297 F. Supp. 2d 171, 177 (D.D.C. 2003).

Thus, in order for CSPI to have standing to bring suit on behalf of its members, the members must have suffered an actionable injury-in-fact, and they have not.  CSPI does not allege that any of its members have sustained personal injuries or economic loss as a result of consuming Burger King food products.  Instead, CSPI claims only that its members have a generalized right to receive information about the trans fat content of food and that Burger King violated that right – even though no harm was caused by its doing so.  It is well established that such generalized grievances are insufficient to establish standing for claims under the District of Columbia Consumer Protection Procedures Act (the "DCCPPA") – the statute at issue in this case.  See, e.g., Hoyte v. KFC Corporation, No. 06-1127, 2007 U.S. Dist. LEXIS 32162, at *7-10 (D.D.C. May 2, 2007); Williams v. Purdue Pharma Co., 297 F. Supp. 2d 171, 177-78 (D.D.C. 2003); see also Statement of Points and Authorities in Support of Burger King Corporation's Motion to Dismiss, at 9-11.

CSPI's failure to allege any injury-in-fact on behalf of itself or its members will lead to the same result in D.C. Superior Court as it should in this Court – outright dismissal.  D.C. courts have long adopted as their own the federal constitutional requirements of case or controversy and the "prudential prerequisites of standing" which include injury-in-fact.  Friends of Tilden Park, 806 A.2d at 1206-07.  Just recently, a D.C. Superior Court held that D.C.'s local Article I courts "insist on the same prudential prerequisites of standing as Article III courts."  Randolph v. ING Life Ins. & Annuity Co., No. 06 CA4932, Order dated June 13, 2007, at 7-8 (D.C. Sup. Ct. 2007) (emphasis added) (Order attached as Exhibit A to the Declaration of Roger E. Podesta).

4

CSPI's argument that remand is appropriate to permit the D.C. Superior Court to make a determination of standing is unavailing since there can be no doubt that the D.C. Superior Court, bound by the same standing requirement as this Court, will come to the same conclusion. The one case cited by the CSPI to the contrary is inapposite. In Mortera v. North America Mortgage Company, the federal court found that the plaintiff did not have standing in federal court and remanded to state court. 172 F. Supp. 2d 1240, 1243-44 (N.D. Cal. 2001). However, California law at that time had different standing requirements than federal law. Id. at 1243 ("[A] plaintiff can sue in California courts under the [Unfair Competition Act] even though he or she has suffered no injury in fact and would not have standing to sue in federal court."] This is not the law in the District of Columbia. In fact, Mortera is no longer the law in California either. Since the passage of Proposition 64 in November 2004, a plaintiff must have sustained injury-in-fact in order to bring a claim under the California Unfair Competition Law in either federal or state court. Filiti v. USAA Casualty Ins. Co., No. 06-2694, 2007 U.S. Dist. LEXIS 44691, at *6 (E.D. Cal. June 20, 2007); Branick v. Downey Savings Loan Ass'n, 138 P.3d 214, 217 (Cal. 2006).

Federal courts have long been bedeviled by situations where the failure to state a claim upon which relief may be granted under Rule 12(b)(6) leads to a lack of subject matter jurisdiction under Rule 12(b)(1). Some courts have resolved the situation exclusively under Rule 12(b)(1) and remanded the case to state court. Other courts have recognized the futility of remand and have granted dismissals where the same deficiencies that led to a lack of federal subject matter jurisdiction would also result in a

5

dismissal of the lawsuit in state court in the event of a remand.  See, e.g., Bell v. City of Kellogg, 922 F. 2d 1418, 1424-25 (9th Cir. 1991); Asarco, Inc. v. Glenara, Ltd., 912 F. 2d 784, 787 (5th Cir. 1990).  The U.S. Supreme Court in dicta has recognized the potential availability of a futility exception in appropriate situations.  Int'l Primate Protection League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 88-89 (1991) superseded on other grounds by statute.  Diligent research reveals no decisions of the D.C. Circuit Court of Appeals either adopting or rejecting the futility exception.  The Republic of Venezuela case cited by CSPI does not even mention the futility exception; it merely cites in passing to the statutory language of 28 U.S.C. 1447(c).[2]  Republic of Venezuela v. Phillip Morris, Inc., 287 F.3d 192, 196 (D.C. Cir. 2002).

If ever there were a case to apply the futility exception, this is the one.  Because the D.C. Superior Courts apply the same standing requirements as the D.C. federal courts, CSPI's concession that it has not alleged sufficient injury-in-fact to confer standing in federal court will inevitably lead to dismissal of any remanded lawsuit.  The futility of such a remand is dramatically illustrated by the subsequent history of the Randolph case upon which CSPI so heavily relies.  In Randolph, the D.C. district court remanded the

---

[2]    Some cases cite to 28 U.S.C. 1447(c) for the principle that remand is required in all cases where the court determines it lacks subject matter jurisdiction.  However, that statutory language does not address circumstances where the same defect that leads to a lack of federal subject matter jurisdiction will necessarily require a dismissal in state court.  As the Ninth Circuit found in Bell, when there are no issues for the state court to resolve, it is an inefficient use of "valuable judicial time and resources" to remand.  922 F.2d at 1425.  There is no reason to believe that Congress intended for the courts to ignore such considerations.  Id. at 1424-25.

case to D.C. Superior Court after finding that the plaintiffs lacked Article III standing and that the D.C. district court therefore did not have subject matter jurisdiction. 486 F. Supp. 2d 1, 25-28 (D.D.C. 2007).[3]  On remand, defendant renewed its motion to dismiss; the D.C. Superior Court agreed with the D.C. district court's finding of no standing and dismissed the complaint. Randolph, Civil Action No. 06 CA4932 Order, dated June 13, 2007, at 8.  In doing so, the D.C. Superior Court held that its requirements for standing are the "same" as those of Article III courts. Id. at 8 (quoting Friends of Tilden Park, 806 A.2d at 1206).  The only effect of the remand was the unnecessary duplication of judicial proceedings.  There is no reason to repeat the experience of Randolph in this case.

It is undeniable that a court has jurisdiction to determine its own jurisdiction. Here, the question of whether this Court has subject matter jurisdiction is identical to the question of whether CSPI has standing to proceed with this lawsuit under D.C. law.  In resolving the question of its own subject matter jurisdiction, this Court will necessarily be resolving the question of standing as a matter of D.C. law.  Other judges in this District have deemed it appropriate to resolve the standing issue under the DCCPPA and dismiss the case. See, e.g., Hoyte, 2007 U.S. Dist. LEXIS 32162, at *7-10; Williams, 297 F. Supp. 2d at 177-78.  This Court should reach the same result.

---

[3]      In Randolph, it was the court that raised sua sponte the question of its own subject matter jurisdiction, while the plaintiff defended its standing to bring suit.  Here, however, CSPI is so determined to avoid federal court jurisdiction that it has made concessions that fatally undermine its standing in D.C. Superior Court as well.  CSPI's position appears analogous to that of a condemned prisoner who hangs himself in his cell the night before his scheduled execution.

7

B.    **Diversity jurisdiction is satisfied here since the amount in controversy exceeds $75,000 exclusive of interests and costs.**

The amount in controversy requirement is met here since the cost to Burger King of complying with CSPI's demands will greatly exceed $75,000.  In this district, "the value of injunctive relief for determining the amount in controversy can be calculated as the cost to the defendant."  Wexler v. United Air Lines, Inc., No. 06-01917, 2007 U.S. Dist. LEXIS 55028, at * 7 (D.D.C. July 31, 2007). [4]  Here CSPI has requested an injunction requiring Burger King to eliminate all sources of trans fat from its restaurant food.  The only real question for purposes of jurisdiction is whether it can be said to a legal certainty that the cost to defendant Burger King of complying with the requested injunctive relief will not exceed $75,000.  Smith v. Washington, 593 F.2d 1097, 1099 (D.C. Cir. 1978).  As Wexler teaches, the cost of compliance is to be determined from the factual submissions of the parties.  Here, CSPI offers only the bald conclusory assertions of Paragraph 11 of the Complaint that "[t]he cost to Burger King of all relief sought is

---

[4]    CSPI's reliance on National Organization of Woman v. Mutual Omaha Insurance Company, 612 F. Supp. 100 (D.D.C. 1985) with its citation to Snyder and Zahn is unavailing since those cases dealt with aggregating plaintiffs' claims in a class action - - the rules of which are inapplicable here and have been overturned by the Class Action Fairness Act of 2005, 28 U.S.C. § 1332 (d).  See Exxon Mobil Corp. v. Allapattah Servs., 545 U.S. 546, 571 (2005) ("[The Class Action Fairness Act] abrogates the rule against aggregating claims, a rule this Court recognized in Ben-Hur and reaffirmed in Zahn").  Nor does this case present the concern that a plaintiff with a small monetary claim will attempt to manufacture federal court jurisdiction by tossing a claim for injunctive relief into the complaint.  Here CSPI requests only injunctive relief and it is the defendant that is seeking to invoke federal court jurisdiction.

less than $74,000"; under <u>Wexler</u>, such unsupported factual assertions are not entitled to any weight.

In contrast, Burger King has submitted two detailed affidavits from Jonathan Muhtar, its Director of Product Marketing, who has personal familiarity with the facts pertaining to the likely costs of compliance. <u>See</u> Affidavit of Jonathan Muhtar dated June 13, 2007 ("Affidavit"); Supplemental Affidavit of Jonathan Muhtar dated August 17, 2007 ("Supplemental Affidavit") (collectively the "Muhtar Affidavits"). The Muhtar Affidavits set forth in detail the basis for his conclusion that the cost of compliance would substantially exceed $75,000. In the absence of any contrary factual allegations or submissions by CSPI, the Muhtar Affidavits should be dispositive. As explained in the Affidavit, there are two principal sources of trans fats in Burger King food products. (Affidavit, at ¶ 6, 7, 9). First, trans fats are present in partially hydrogenated cooking oil used to prepare certain food products. Eliminating partially hydrogenated cooking oil involves researching and testing alternative oils, entering into supply contracts, and modifying operations manuals. (Affidavit, at ¶ 8). CSPI does not appear to contest that the cost of taking these steps for Burger King's seven franchise restaurants in the District of Columbia would substantially exceed $75,000. Instead, CSPI notes that on July 6, 2007 (approximately seven weeks after commencement of this lawsuit), Burger King announced a nationwide rollout replacing partially hydrogenated cooking oils with trans fat free cooking oils. Thus, CSPI argues that Burger King must have already absorbed the costs of compliance and that these costs should be disregarded for purposes of

computing the jurisdictional amount.[5]  But this misses the jurisdictional point.  The voluntary replacement of partially hydrogenated cooking oils was announced several weeks after the removal of this case to federal court and the amount in controversy is determined for jurisdictional purposes on the date of removal.  See Kopff v. World Research Group, LLC, 298 F. Supp. 2d 50, 57 (D.D.C. 2003) ("It is established that the time for assessing jurisdiction amount is the time of removal.").  Post-removal activities by the defendant cannot affect the jurisdictional amount in controversy.

In any event, the conversion of partially hydrogenated oils to trans fat-free oils in Burger King D.C. restaurants is not expected to occur until the end of next year.  In addition to the various research and development costs described in Paragraph 8 of the Affidavit, there are also incremental costs in transitioning the oil.  The annual incremental costs to fully convert the seven D.C. restaurants to trans-free oil are between $3,000 - $6,000 per restaurant for a total cost of $21,000 - $42,000 per year. (Supplemental Affidavit, at ¶2).

More importantly for present purposes, however, there is a second source of trans fats in foods sold in Burger King's restaurants that are not the subject of the nationwide rollout.  Trans fats are a component of pre-prepared "par-fried" food products and baked goods that Burger King purchases from outside vendors, and then sells at its restaurants.

---

[5]    CSPI does not explain why it is continuing to seek injunctive relief requiring the defendant to take actions that Burger King is already taking of its own accord.

(Affidavit, at ¶ 9).  Thirteen Burger King menu items fall into this category, see Exhibit 1 to the Affidavit, and collectively these items account for approximately twenty-five percent of the total menu mix at Burger King restaurants.  (Id. at ¶12).  In order to replace these items, Burger King would need to complete the process of researching and testing alternatives, and renegotiating supply contracts.  (Id. at ¶ 11).  As Muhtar attests, the expense of research and development alone would substantially exceed $75,000.  (Supplemental Affidavit, at ¶ 3).  Even after completion of the research, testing and negotiation process, and assuming that satisfactory substitutes can be found, the estimated incremental costs would be at least $14,000 per year for the D.C. restaurants.  (Id. at ¶ 3).

Moreover, if suitable alternatives were not found within the period required by the court's putative injunction, Burger King would be forced to discontinue selling all the par-fried items.  Muhtar estimates, based on his personal knowledge, that discontinuation of these thirteen items would result in lost revenue of $250,000 per year at each of Burger King's seven District of Columbia restaurants (or $1,750,000 per year in the aggregate).  (Affidavit, at ¶12).  Since the typical Burger King restaurant operates at a gross profit margin of 70%, the resulting profit loss is $175,000 per restaurant, per year (or $1,225,000 per year in the aggregate).  (Supplemental Affidavit, at ¶ 4).

In these circumstances, there is ample factual basis for concluding that the jurisdictional amount of $75,000 has been satisfied.

For the foregoing reasons, Defendant Burger King Corporation respectfully requests that CSPI's motion to remand this lawsuit to District of Columbia Superior Court be denied.

Dated: New York, New York
       August 17, 2007

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

/s/ Roger E. Podesta
By:    Roger E. Podesta
      (admitted pro hac vice)
      Erich O. Grosz
      (admitted pro hac vice)

919 Third Avenue
New York, N.Y. 10022
Tel: (212) 909-6000
Fax: (212) 909-6836

/s/ Ada Fernandez Johnson
By:    Ada Fernandez Johnson
      (Bar No. 463296)

555 12th St., N.W.
Suite 1100E
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383-8118

*Attorneys for Defendant*
*Burger King Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Center for Science in the Public Interest** )<br><br>Plaintiff, )<br><br>v. )<br><br>**Burger King Corporation,** )<br>5505 Blue Lagoon Drive )<br>Miami, FL 33126, )<br><br>Defendant. )<br> )<br> )<br> )<br> )<br> )<br> ) | Civil Action No. 07 CV-1092 (RJL)<br><br>Judge Richard J. Leon |

## SUPPLEMENTAL AFFIDAVIT OF JONATHAN MUHTAR

I, Jonathan Muhtar, hereby affirm under penalty of perjury:

1.    I am the Director of Product Marketing for Burger King Corporation ("BKC") and have personal familiarity with the facts set forth herein. I submit this Supplemental Affidavit to respond to certain matters raised by plaintiff with respect to my Affidavit of June 13, 2007 (the "Affidavit").

2.    In paragraphs 7 and 8 of my Affidavit, I described the measures required to replace the partially hydrogenated oils used in Burger King restaurants with trans fat-free cooking oils. While BKC has begun to roll out trans fat-free oils in the United States and intends to supply trans fat-free oils to all its United States and Canadian restaurants by the end of next year, Washington, D.C. is not scheduled for conversion until the later stages of the rollout. Based on BKC's experience to date in areas where the rollout has been completed, the incremental cost of conversion to trans fat-free cooking oils is between $3,000 and $6,000 per restaurant per year. This is in addition to the developmental and research costs described in my Affidavit. Given that there are seven

Burger King franchised restaurants in Washington, D.C., the total incremental cost would be between $21,000 and $42,000 to convert to the use of trans fat-free cooking oils in Washington, DC.

3.    In paragraphs 9 through 11 of my Affidavit, I described the measures necessary to eliminate sources of artificial trans fats in the pre-prepared "par-fried" food products and baked goods that Burger King franchisees purchase from approved suppliers and sell at Burger King restaurants. BKC is still in the research and testing stage for the elimination of artificial sources of trans fats from these products. Based on the preliminary results of our product development process, new, completely trans fat-free par fried french fries (one of the biggest parts of a BKC restaurant's entire menu mix) will likely cost approximately $1,000 per year in additional incremental food costs per Burger King restaurant. Thus, the total incremental cost for french fries alone would be $7,000 per year for the seven BKC restaurants in Washington, D.C. Development of new completely trans fat-free versions of the other 12 par-fried and baked good products in BKC's menu mix is likely collectively to result in additional annual incremental food costs at least as great as those for french fries. This is in addition to costs BKC would incur in sourcing, testing, consumer testing, contract negotiations and supply chain adjustments with dozens of suppliers. These research and development costs alone would cost BKC in excess of $75,000.00

4.    In paragraph 12 of my Affidavit, I estimated that discontinuing use of par fried products and baked goods that contain trans fats (in the event that CSPI obtained its requested injunctive relief and BKC could not develop satisfactory trans fat-free products in time) would result in a loss of sales of at least $250,000 per restaurant per year. The

typical Burger King restaurant operates on a 70% gross margin.  Thus, the loss of $250,000 in sales per restaurant equates to a decrease in gross profit margin of $175,000 per restaurant.  For some restaurants, the impact on profitability of such a substantial reduction in gross profit margin could be sufficient to force the closure of the restaurant.

I declare under the penalty of perjury that the foregoing is true and correct. Executed at Miami, Florida on August 17 2007.


Jonathan Muhtar

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| **Center for Science in the Public Interest** | ) | |
| | ) | Civil Action No. 1:07-cv-01092 |
| Plaintiff, | ) | (RJL) |
| | ) | |
| v. | ) | |
| | ) | Judge Richard J. Leon |
| **Burger King Corporation** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**DECLARATION OF ROGER E. PODESTA**

I, ROGER E. PODESTA, hereby declare as follows:

1. I am a member of the Bar of the State of New York and a partner with Debevoise & Plimpton LLP, counsel for Burger King Corporation. I have been admitted to appear *pro hac vice* in this lawsuit.

2. I submit this declaration pursuant to 28 U.S.C. § 1746, in support of Burger King Corporation's Opposition to Plaintiff's Motion to Remand.

3. In support of Burger King Corporation's Opposition, I attach a true and correct copy of Judge Frederick H. Weisberg's Order dated June 13, 2007 in <u>Randolph v. ING Life Insurance and Annuity Company</u> (D.C. Superior Court, No. 06 CA 4932) as Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 17, 2007
        New York, New York

/s/ Roger E. Podesta_____
Roger E. Podesta

# Exhibit A to Declaration of Roger E. Podesta

**No. 1:07-cv-01092 (RJL)**

Filed
D.C. Superior Court
07 Jun 13 P03:29
Clerk of Court

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

| | |
|---|---|
| REGINA RANDOLPH, ET AL., | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : Civil Action No. 06 CA 4932 |
| | : Calendar 4 |
| ING LIFE INSURANCE AND | : |
| ANNUITY COMPANY, | : |
| | : |
| Defendant. | : |

**ORDER**

This matter is before the court on the Defendant's Motion to Dismiss Plaintiffs'

First Amended Complaint, pursuant to Super. Ct. Civ. R. 12(b)(1), 12(b)(6). Plaintiffs

are seven current or retired District of Columbia employees. On June 27, 2006, they

filed their original complaint in Superior Court, alleging two counts of invasion of privacy,

one count of negligence, and one count of gross negligence. All claims arise out of the

theft of a computer in an otherwise routine residential burglary. The computer belonged

to an employee of Defendant ING Life Insurance and Annuity Company ("ING"), and it

allegedly contained within its memory personal and financial records of Plaintiffs and

thousands of other District of Columbia employees, who are participants in a deferred

compensation program to which ING provides administrative services, record keeping,

and investment advice. Plaintiffs alleged in their original Complaint that the theft of this

computer containing their personal information has exposed them to a heightened risk of identity theft and that ING's negligence or gross negligence in allowing this information to be stored on an employee's computer and removed from otherwise secure facilities invaded their privacy and proximately caused them damages for which they seek compensation and injunctive relief.

Defendant removed the complaint to the United States District Court and promptly filed a motion to dismiss based on lack of standing, failure to state a claim, and mootness. On February 20, 2007, in a thorough and well-reasoned opinion, District Judge Coleen Kollar-Kotelly concluded that Plaintiffs had failed to establish Article III standing and, without reaching Defendant's alternative grounds for dismissal, denied Defendant's motion to dismiss without prejudice and remanded the case to the Superior Court, pursuant to 28 U.S.C. § 1447(c). Thereafter, Plaintiffs filed their First Amended Complaint, which alleged no new facts, but added claims of breach of fiduciary duty or confidential relationship and what purport to be statutory causes of action. Defendant has renewed its motion to dismiss, this time directed at the First Amended Complaint.

## STANDARD OF REVIEW

A trial court considering a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Superior Court Rules of Civil Procedure must construe the complaint "in the light most favorable to the plaintiff" and must accept as true all allegations of fact set forth in the complaint. *Larijani v. Georgetown University*, 791 A.2d 41, 43 (D.C. 2002) (quoting *McBryde v. Amoco Oil Co.*, 404 A.2d 200, 202 (D.C. 1979)). The court may grant a Rule 12(b)(6) motion to dismiss only where it appears "beyond doubt" that the

plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Id.*; *Owens v. Tiber Island Condo. Ass'n.*, 373 A.2d 890, 893 (D.C. 1977) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). A Rule 12(b)(1) motion addressed solely to the allegations of the complaint and challenging subject matter jurisdiction based on lack of standing is judged by essentially the same standard. *See Heard v. Johnson*, 810 A.2d 871, 877-78 (D.C. 2002); *see also Bible Way Church v. Beards*, 680 A.2d 419, 426 n. 4 (D.C. 1996).

## THE DISTRICT COURT RULING AND LAW OF THE CASE

Defendant invites this court not to address the merits of its standing argument, but to grant its motion based solely on Judge Kotelly's ruling. According to Defendant, the court should accept that ruling as its own under principles derived from the law of removal or should treat the ruling as the "law of the case" and adhere to it for that reason. As tempting as it is to take the short route to the decision, the court declines to accept Defendant's invitation for two reasons. First, although Judge Kotelly acknowledged Defendant's position that she should grant Defendant's motion to dismiss for lack of standing, rather than remand, on the ground that the District of Columbia local courts would apply the same principles of standing as the Article III federal courts, she expressly declined to dismiss the complaint and remanded for this court to decide the question of standing under local law.[1] Second, Defendant's motion in the District

---

[1] Defendant argues that Judge Kotelly remanded, rather than dismissed, not because she had reservations about whether Plaintiffs could establish standing to sue in the Superior Court, but because she felt that the removal statute gave her no other option. Regardless of her reasons, however, the fact remains that Judge Kotelly did not decide whether Plaintiffs have standing to sue in the Article I courts of the District of Columbia.

Court was directed at Plaintiffs' original Complaint, not their First Amended Complaint that is now before this court. Defendant relies in part on Judge Kotelly's statement that her ruling would not change even if Plaintiffs had pled in their Complaint the claims of breach of fiduciary duty or confidential relationship and the statutory claims that they have now included in their amended Complaint, but those comments were not necessary to her decision and, even if not pure *dicta*, do not have the requisite degree of finality to bind this court under the law of the case doctrine or cause it to treat the ruling as its own under principles derived from the law of removal.

For the foregoing reasons, the court feels constrained to reach the merits of Defendant's motion and to rule *ab initio* on the issues presented. ING contends that the court lacks subject matter jurisdiction and should dismiss the First Amended Complaint because Plaintiffs lack standing to sue. According to ING, Plaintiffs have failed to allege that they have suffered or will suffer an injury-in-fact, and their fear that they may suffer an injury from theft of their identity in the future is not a sufficient basis on which to claim standing to bring this action. As an alternative, and only if the court declines to dismiss for lack of standing, ING asserts that Plaintiffs have also failed to state a claim on which relief can be granted (again because of no injury) and that any such claim would be moot in any event because ING voluntarily offered all of the relief to which Plaintiffs would be entitled even if the injury they were alleging were sufficiently real to confer standing and to state a claim on which relief could be granted. Because the court

4

agrees with Defendant that the complaint must be dismissed for lack of standing, it does not reach Defendant's alternative grounds for dismissal.[2]

## STANDING

The local courts of the District of Columbia are not established under Article III of the Constitution. Nonetheless they, like their Article III counterparts, exercise jurisdiction only over actual cases and controversies and insist on the prudential prerequisites of standing. *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1206 (D.C. 2002); *Lee v. District of Columbia Bd. of Appeals and Review*, 423 A.2d 210, 216-17 (D.C. 1980). To have standing, the Plaintiff "must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, …and (b) actual or imminent, not conjectural or hypothetical." *Friends of Tilden Park*, 806 A.2d at 1207 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *see also Community Credit Union Services, Inc. v. Federal Express Services Corp.*, 534 A.2d 331, 333 (D.C. 1987). Moreover, to the extent Plaintiffs purport to be bringing this action on behalf of others similarly situated, "before one may sue for damages on behalf of others – whether the 'others' are members of an organization or a class of consumers – he must show injury to himself." *Consumer Federation of America v. UpJohn Co.*, 346 A.2d 725, 729 n.11 (D.C. 1975); *see also*

---

[2] The court notes that in a case like this, standing and failure to state a claim are first cousins. Without a cognizable injury-in-fact, Plaintiffs lack standing to sue and, for the same reason, have arguably not stated a claim for relief under any of the various tort theories alleged in the First Amended Complaint. Defendant's mootness argument appears to depend, to some degree, on facts that are outside the pleadings, some of which may be disputed. Although the court is permitted to resolve factual disputes on a "factual attack" under Rule 12(b)(1) without converting the motion into a Rule 56 motion for summary judgment, it is unnecessary to do so in this case because Plaintiffs so plainly lack standing to bring the action whether or not their claims would all be moot.

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976); *O'Shea v. Littleton*, 414 U.S.488, 494 (1974).

Plaintiffs allege, in the light most favorable to them, that they are more vulnerable to identity theft now that their personal data has fallen into the hands of the thief of the computer or one who receives it from the thief, and the Plaintiffs who are police officers allege that their home addresses may be compromised, subjecting them to possible threats or violence.[3]  No Plaintiff alleges that his or her identity has in fact been stolen or used, and no police officer Plaintiff alleges that his or her residence has been revealed or threatened in any way.  The most Plaintiffs can claim is that they are worried that these harmful events may occur and that they "have incurred or will incur actual damages" to protect their credit or to repair any damage if it occurs.

These allegations are insufficient to confer standing.  Fear of future harm, even if reasonable, is simply not the kind of concrete and particularized injury, or imminent future injury, courts will recognize as a basis on which to bring an action for compensatory or injunctive relief.[4]  The claim that Plaintiffs "have incurred or will incur" certain expenses is vague and indefinite, but even if it were more specific and accepted as true, it does not suffice to confer standing.  On this point, the court agrees with Judge Kotelly's analysis in her remand order:

> ...[E]ven if individual Plaintiffs have purchased and paid for credit monitoring services, the 'lost data' cases cited by ING clearly reject

---

[3] The heightened concern of the police officer Plaintiffs appears to be something of a makeweight, and the real thrust of the Complaint seems to be the risk of identity theft as it relates to accounts and financial credit.

[4] It should be noted that for all anyone knows at this time, there has not been **any** exposure of Plaintiffs' personal information.  Even if the information was not password protected, as Plaintiffs allege, it is at least possible that the thief kept the computer or passed it to someone who erased its hard drive and memory to make it more pristine for resale.  Unless and until any of the stored information is actually used, it is impossible to know whether Plaintiffs will ever suffer any real, as opposed to imagined, injury.

6

the theory that a plaintiff is entitled to reimbursement for credit monitoring services or for time and money spent monitoring his or her credit. [citations omitted] As [one] court explained, an argument that the time and money spent monitoring a plaintiff's credit suffices to establish an injury 'overlook[s] the fact that their expenditure of time and money was not the result of any present injury, but rather the anticipation of future injury that has not materialized.' [citation omitted]

*Randolph v. ING Life Insurance and Annuity Co.*, No. 06-1228, 2007 U.S. Dist. LEXIS 11523, at *19-20 (D.D.C. Feb. 20, 2007).

Several courts have been presented with claims of lost data similar to those in Plaintiffs' complaint, and all have found that the plaintiffs lacked the requisite injury to establish standing to sue or to state a legally sufficient claim for relief. *See Bell v. Acxiom Corp.*, No. 4:06CV00485-WRW, 2006 U.S. Dist. LEXIS 72477, at *8-10 (E.D. Ark. Oct. 3, 2006) (lack of standing); *Key v. DSW, Inc.*, 454 F. Supp. 2d 684, 688-89 (S.D. Ohio 2006) (lack of standing); *Giordano v. Wachovia Sec.*, LLC, No. 06-476(JBS), 2006 U.S. Dist. LEXIS 52266, at *12 (D.N.J. July 31, 2006) (lack of standing); *see also Kahle v. Litton Loan Servicing LP*, No. 1:05cv756, 2007 U.S. Dist. LEXIS 35845, at *19-21 (S.D. Ohio May 16, 2007) (summary judgment based on no injury-in-fact); *Forbes v. Wells Fargo Bank, N.A.*, 420 F. Supp. 2d 1018, 1021 (D. Minn. 2006) (same); *Guin v. Brazos Higher Education Service Corp. Inc.*, No. 05-668(RHK/JSM), 2006 U.S. Dist. LEXIS 4846, *15-16 (D. Minn. Feb. 7, 2006) (same); *Stollenwerk v. Tri-West Healthcare Alliance*, No. 03-0185-PHX-SRB, 2005 U.S. Dist. LEXIS 41054, *14 (D. Ariz. Sept. 8, 2005), *appeal docketed*, No. 05-16990 (9th Cir. Oct. 19, 2005) (same; distinguishing toxic exposure cases). Plaintiffs have cited no case to the contrary, and the court has found none. Although the decided cases are from federal courts and are based on principles of Article III standing, they are no less authoritative given the doctrine that our local Article I courts will accept jurisdiction only over actual cases and controversies and

insist on the same prudential prerequisites of standing as the Article III courts. *Friends of Tilden Park*, 806 A.2d at 1206.

For the reasons previously noted, the court does not consider itself bound by Judge Kotelly's ruling. Nonetheless, the court agrees with the Judge Kotelly's reasoning in concluding that Plaintiffs lack standing with respect to the claims stated in their original Complaint. The only remaining question is whether the outcome changes now that Plaintiffs have pled in their amended Complaint (as opposed to merely arguing in their briefs) claims of breach of fiduciary duty or confidential relationship and what purport to be statutory causes of action. The First Amended Complaint pleads no new facts. It simply supplements its list of grievances with additional tort theories. The claimed injuries remain the same – fear of future identity theft and the costs and inconvenience associated with it if it should occur. As such, Plaintiffs' standing to bring their added claims rests on the same inadequate foundation as their standing with respect to their original claims.

Assuming, without deciding, that ING acted as a fiduciary with respect to these Plaintiffs in its role as administrator of the § 457 deferred compensation plan for thousands of District of Columbia employees, which is by no means certain based on the Complaint, the tort of breach of fiduciary duty requires not only proof of the fiduciary relationship and its breach, but also proof of a legally cognizable injury, which Plaintiffs have not alleged. *See Beckman v. Farmer*, 579 A.2d 618, 651 (D.C. 1990). Plaintiffs' lack of standing is not cured simply by renaming the tort theory under which they are suing. Plaintiffs' inability to plead a "concrete and particularized" injury and one that is

"actual or imminent" is as fatal to their claims of breach of fiduciary duty or breach of a confidential relationship as it is to their original claims.[5]

Finally, the First Amended Complaint attempts to locate the court's subject matter jurisdiction (and Plaintiffs' standing to invoke it) by purporting to plead claims under two statutes, neither one of which has anything to do with the claims in this case. The first, D.C. Code §1-626.13, relates to the duties and liabilities of the Trustee of the Trust established pursuant to D.C. Code § 1-626.11, which holds the funds contributed by the District as part of the defined contribution plan set up under D.C. Code § 1-626.05(3). *See also* D.C. Code § 1-626.04(7) (definition of "Trust").[6] Yet, the complaint itself identifies the Plaintiffs as participants in the § 457 deferred compensation plan set

---

[5] It is not entirely clear that the First Amended Complaint includes a claim of breach of a confidential relationship that is separate from the claim of breach of fiduciary duty. This jurisdiction recognizes the tort of breach of a confidential relationship, but it has been discussed only in a few cases and its precise contours have not been fully articulated. *See Suesbury v. Caceres*, 840 A.2d 1285, 1287 (D.C. 2004); *Doe v. Medlantic Health Care Group, Inc.*, 814 A.2d 939, 950-51 (D.C. 2003); *Vassiliades v. Garfinckel's, Brooks Bros., Miller & Rhoades, Inc.*, 492 A.2d 580, 591(D.C. 1985). At a minimum, such a claim requires proof of **an injury** caused by an unconsented, unprivileged disclosure to a third person of information the disclosing party has learned within a confidential relationship. *Vasssiliades*, 492 A.2d at 591. The cases that have recognized the claim in this jurisdiction have done so solely in the context of physician-patient or hospital-patient relationships. Therefore, it is doubtful that the relationship between ING and these Plaintiffs satisfies the requirement of a confidential relationship for purposes of this particular narrowly-defined tort. Moreover, the data ING allegedly failed to protect, while undoubtedly personal, is not the same kind of intimate and private medical information that was disclosed in the confidential relationship cases. Unlike private medical information, the kind of information at issue in this case is routinely disclosed by most people on an almost daily basis, and it becomes a matter of concern only if it falls into the hands of a thief. Finally, ING did not disclose **any** private information. If there has been any "disclosure" in this case – and there may not have been – it was accomplished only through the intervening criminal act of at least one other person. The First Amended Complaint, like the original Complaint, alleges that Defendant ING "disclosed" Plaintiffs' personal data by, *inter alia*, allowing its own employee to download the data into his computer. However, as a matter of law, if any trusted employee of ING has a confidential relationship with Plaintiffs, all do. Sharing of Plaintiffs' data by and between ING employees is a necessary part of the services ING provided to the plan, which would not be actionable as a prohibited disclosure even if there were a confidential relationship. In any event, Plaintiffs cannot establish standing without an actual or imminent concrete injury, and the kind of inchoate "disclosure" to outsiders alleged in the complaint does not establish standing for the tort of breach of a confidential relationship any more than it does for the other torts Plaintiffs have alleged.

[6] Plaintiffs' opposition brief argues that the statutory definition of "Trust" is not relevant to their claims because the definitions in D.C. Code § 1-626.04 are "For the purpose of §§ 1-626.05 through 1-626.12," and they are proceeding under D.C. Code §§ 1-626.13 and 1-626.14. However, Plaintiffs' effort to parse

up under D.C. Code § 1-626.05(2), for which Defendant ING served as the administrator.  Likewise, the second statute, D.C. Code § 1-741, relates to the retirement Funds for District of Columbia police, firefighters, teachers, and judges established under D.C. Code §§ 1-712 – 1-714, not to the deferred compensation plan at issue in this case.  *See also* D.C. Code § 1-702(10) (definition of "Fund") and D.C. Code § 1-702(20) (definition of "fiduciary"). [7]

For all of the foregoing reasons, it is this 13th day of June, 2007,

ORDERED that Defendant's motion to dismiss the First Amended Complaint for lack of standing, pursuant to Super. Ct. Civ. R. 12(b)(1), be, and it hereby is, granted.

_____
JUDGE FREDERICK H. WEISBERG

---

the statutory scheme to suit their present purposes is unavailing. There is only one Trust, and the references to "the Trust" in sections 1-626.13 and 1-626.14 can only refer to the Trust established pursuant to section 1-626.11, for which ING was not the Trustee.

[7] Plaintiffs' opposition brief appears to argue that the statutes pertaining to the District's defined contribution plan and to the retirement Funds for police, firefighters, teachers, and judges are somehow relevant to the standing issue because each of the Plaintiffs is also a participant in one or the other of these retirement programs in addition to their participation in the § 457 deferred compensation plan. However, the Complaint is based solely on Plaintiffs' participation in the deferred compensation plan and, more importantly, the data in the stolen computer was entrusted to ING in connection with its role as administrator of the deferred compensation plan, not some other retirement program in which Plaintiffs may also be participants. Moreover, even if Plaintiffs' reliance on these statutes were not misplaced, the result would be the same.  The private rights of action for breach of fiduciary duty authorized by D.C. Code § 1-626.14 and D.C. Code § 1-742, respectively, require an injury-in-fact to invoke the jurisdiction of the court no less than Plaintiffs' common law causes of action.  There is nothing in the two statutory schemes to suggest that the Council intended to legislate away the time-honored principles of standing as they apply to claims of individuals under these statutes, whether alone or as representatives of a putative class. *See Hakki v. Zima Co.*, No. 03-9183, 2006 WL 852126, at *2 n.1 (D.C. Super. Ct. Mar. 28, 2006) (Weisberg, J.); *see also Newman v. District of Columbia*, 518 A.2d 698, 703 (D.C. 1986).  Thus, even if the two statutory provisions on which Plaintiffs purport to rely were applicable to their claims, Plaintiffs' allegations that they face a heightened risk of identity theft and that they "have incurred or will incur" unspecified damages to prevent identity theft or to repair stolen credit do not plead the kind of actual or imminent injuries that will confer standing to sue, whether the cause of action finds its source in a statute or is a creature of common law.

10

Copies served electronically through eFiling for Courts.

11